## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-338 (JEB)** |
| **v.** | : | |
| | : | |
| **MICHAEL GERARD MARROQUIN,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Michael Gerard Marroquin to ten months of incarceration, twenty-four months supervised release, and $500 restitution.

### I.    Introduction

Michael Marroquin, a sixty-four-year-old consignment shop owner from Nederland, Texas, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Marroquin pleaded guilty without a plea agreement to violations of 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), 40 U.S.C. § 5104(e)(2)(E), and 40 U.S.C. §5104(e)(2)(G). The government's recommendation is supported by the defendant's: (1) harassing and threatening conduct towards police officers during the riot, including by the House Chamber door as lawmakers were sheltering in place; (2) extensive period of time inside the Capitol building; (3) criminal history, which includes convictions for rape and human trafficking of minors in South America; and (4) his efforts to evade responsibility and shift blame for the riot onto others; and (5) his lack of remorse.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Marroquin's crime support a sentence of twelve months of incarceration in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 1-1.

### Marroquin's Role in the January 6, 2021 Attack on the Capitol

#### Preparation & Travel to Washington

Using social media, Marroquin sought donations to "sponsor" his trip to Washington. In an early morning Facebook post on January 4, 2021, Marroquin stated, "I have been sponsored to fly to Washington DC. On the 4th 5th and 6th ofJanuary (sic) to represent you at the TRUMP RALLY to stop the steal!" In a comment on this post, Marroquin stated that the event motivating

his trip was "the counting of the electoral votes in the US Legislator by Mike Pence VP." In a subsequent Facebook post later that same day, Marroquin stated "Me me me  I land at 4:50 in Washington! I'm going straight to the capital (sic) and I'll go live at that time, I hope you watch." Marroquin recorded "interviews" with other people travelling to Washington with him.

<u>Activities in Washington</u>

Marroquin arrived in Washington D.C. on January 4, 2021. Marroquin posted a video to Facebook from the Lincoln Memorial at just after 2:00 a.m. on January 5, 2021. In this video Marroquin stated, "This is the turning point in our history…this is do or die...this is where the true patriots come out and we're heard. We only have one opportunity here. […] [W]e came here to show force, maybe to say 'hey, the silent majority is not silent anymore.'" Marroquin ended his video message by saying, "We're going on the offensive."



*Figure 1: Screengrab of Facebook Live*

Throughout the day on January 5, 2021, Marroquin moved around Washington. He filmed monuments, the White House, the staging being built for the then-president's speech, barricades that had been erected to control the crowd, and other people who had travelled to Washington to attend the then-president's rally.

<u>January 6</u>

On the morning of January 6, 2021, Marroquin attended the then-president's rally on the National Mall. Marroquin was dressed in a black hoodie sweatshirt with an orange "Q" and wore a "Trump 2020" red baseball cap. Following the speech, Marroquin moved to the Capitol. Rioters first breached the United States Capitol through the Senate Wing Door at 2:13 p.m. Seven minutes later, Marroquin entered the Capitol through that same door. Entering at this point at this time means that he would have passed through the chaos that was unfolding on the West Front, including exposure to chemical irritants, loudspeakers ordering the crowd to disperse, and the presence of hundreds of officers, many of whom were dressed in riot gear. Walking through this door, he would have been able to see the shattered glass on either side of the door and the windows surrounding it, and would have heard the blaring alarm. None of this deterred Marroquin.



*Figure 2: Defendant circled in yellow, approximately 2:20 p.m.*

From the Senate Wing Door, Marroquin traveled throughout the Capitol Building. He cheered on the other rioters, yelling, "Let's go!" as he peered into ransacked officers. He witnessed rioters beating on doors and screaming for the blood of elected officials. In the face of this violence,

4

he pointed to another rioter and said, "Hey! You're not doing anything wrong! This is our house." He filmed himself almost constantly.

Marroquin then moved toward the Crypt. Inside the Crypt, he recorded himself yelling, "I want to tell you something: You arrest me, but this is our House! No! You'll never take us! We're not silent anymore! Understand?" He then turned the camera forward again and continued to film the chaos of the riot while imploring the crowd to "keep moving" in the face of a line of police officers who were holding the crowd back inside the Crypt.



*Figure 3: Marroquin's self-recorded video from the Crypt.*

Marroquin then personally confronted a line of police officers, telling them repeatedly to leave and to "drop their guns" and "get out of my house." Immediately thereafter, Marroquin watched and kept recording as the mob inside the Crypt overwhelmed and assaulted the dramatically outnumbered officers at whom he had just been screaming. Once the crowd had pushed through the police line, Marroquin continued shouting encouragement to the rioters: "We ain't goin' to stop! Go through the door!"

After ascending a spiral staircase towards the Rotunda and Speaker's Office and despite coughing as a result of the chemical irritants in the air, just after 2:30 p.m. Marroquin walked through the Rotunda and towards the entrance to the House Chamber. At the entrance to the House Chamber, where many lawmakers were still sheltering inside and waiting to be evacuated, there was a protracted standoff between rioters and armed police officers who were holding them back from breaching the Chamber. Police officers and lawmakers inside the Chamber used furniture to barricade the door and prevent rioters from smashing through it, but rioters were able to break the glass mounted inside the door. Marroquin, who was initially in the middle of the crowd, maneuvered his way to the head of the column of rioters and was soon at the head of the stand-off.

Through the shattered windows—while he was literally looking down the barrel of a police officer's gun—Marroquin shouted at the officer, "Sir, your constitution says that you're supposed to protect the constitution—you're a traitor if you against the U.S.!"



*Figure 4: Screengrab from video on Marroquin's phone outside House Chamber. In the background of this video, lawmakers can be seen being evacuated from the Chamber.*

Two police officers held Marroquin at gun point.  As they pointed their guns at him, Marroquin told them, "I don't mind dying." The officers wouldn't relent and did not permit the rioters to enter the Chamber.   In response, Marroquin said, "they're not constitutionalists." Marroquin continued to harass officers near the House Chamber for approximately four more minutes.  Then, police forced him and the other rioters back to the Rotunda. While he was inside of the Rotunda, Marroquin, minimizing his criminal conduct in the Capitol, then falsely boasted about his law-abiding nature to other rioters in the crowd by repeatedly stating that he had "never had a ticket"[2] and "never been arrested."[3]

Officers in the Rotunda repeatedly told Marroquin and the other rioters to leave the building. Despite their clear orders, Marroquin stayed in the Rotunda for approximately ten minutes. When officers tried to prevent the rioters from filling the Rotunda, Marroquin yelled at the officers to "quit pushing us!" He also filmed other rioters accosting and assaulting the officers who were holding them back. Eventually, the officers were able to subdue the crowd and slowly push them from the Rotunda into the vestibule near the East Rotunda Door. Still, Marroquin refused to leave the building, despite repeated indications from police officers that he needed to do so. Inside the vestibule, and as he was moving towards the East Rotunda Door, Marroquin recorded himself explaining to a fellow rioter, "We have to go to the edge—the precipice they call it—the edge of destruction." When the other rioter asked about the Insurrection Act, Marroquin started talking about "190 indictments" of "30,000 people." During this conversation, he made repeated references to parts of the Q'Anon conspiracy theory. Regarding his personal objectives in the Capitol, he stated it was "to get investigations and reasonable accountability for those seven

---

[2] The defendant was ticketed for speeding in 2014 and required to complete a driving safety course.
[3] As will be discussed further below, Marroquin has been arrested before. He was, in fact, convicted in Bolivia for trafficking a minor in 2008 and sentenced to twenty-five years in prison.

states that when they find out they're bad, they're going to do all 50 and see who really won and we will end up with 30 more representatives and about 12 more senators." Marroquin added, "It's not about winning—we've already done what we need to do." Shortly thereafter, at approximately 3:30 p.m., Marroquin was pushed out of the Capitol through the East Rotunda Door. Marroquin was inside the Capitol building for more than an hour.

Marroquin's Social Media Posts

After the riot, Marroquin posted repeatedly to his Facebook account. On January 9, after he flew back to Texas, Marroquin shared a video to his Facebook that allegedly described what happened on January 6. In the caption to the video, Marroquin stated, "I was there Saw this ask me if you want to know the truth[.]" In a subsequent post on January 10, Marroquin shared a post about the riot at the Capitol in which he tried to claim that "antifa" was responsible for the violence:



Michael Marroquin
10 January at 07:30 · YouTube · 🌐

I was here and Antifa was definitely here. Patriots made sure that Antifa stopped doing any damage. I was supporting the Patriots who defended the Capital and filmed all of it with my phone which was later taken from me. The footage was Patriot supportive and showed many patriots actually fighting the Antifa idiots who were trying to do damage to the different parts of the Capital. Most of my experience was inside the Capital that the police had opened and invited us into the Capital! It was all a setup to make it look like the Patriots were the ones doing the damage. ALL lies I was there!

<em>Marroquin's Interview</em>

On March 31, 2022, Marroquin was interviewed by FBI agents in a non-custodial interview. Marroquin admitted that he had been present in Washington on January 6, 2021. Marroquin stated that he went to Washington for the then-president's rally and that he went to the Capitol after the rally. But, when agents asked him if he had entered the Capitol Building, he

8

denied doing so. Marroquin only admitted entering the Capitol Building after the agents showed him images taken from Capitol CCV that showed him inside the building. Regarding his approach to the Capitol, Marroquin stated that he made sure to stay on the path "between" barriers to approach the Capitol, but denied seeing other barriers. Marroquin stated that he thought he was permitted to enter the Capitol but not permitted to enter the floor of the House or Senate Chambers.

*Marroquin's Post-Arrest Statements*

Marroquin was arrested on July 20, 2023. On July 28, 2023, Marroquin gave an interview to a local news outlet in Galveston in which he stated, "Patriots made sure that antifa stopped doing the damage. I was supporting the patriots who defended the Capitol and filmed all of it with my phone. […] It was a set up to make it look like the patriots were the ones doing the damage." Angel San Juan, CBS 6 KFDM (July 28, 2023), available at https://kfdm.com/news/local/mid-county-businessman-i-was-supporting-the-patriots-who-defended-the-capitol. Twelve days later, he posted a photo of a harbored boat at sunset to Facebook with the caption, "THANK YOU! This experience I'm going through is so incredible 20 more people on my friends list. I'm having people come by my store trying to buy everything. Police men have come to shake my hand. And my phone won't. Stop ringing Thank you all for all your support and prayers[.]"

*The Charges and Plea Agreement*

On September 27, 2023, Marroquin was charged in a six-count indictment with violations of 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(A), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On February 21, 2024, he pled guilty without a plea agreement to Counts Two through Six of the indictment. That same day, the Court stayed proceedings as to Count One until after the Supreme Court decided *Fischer v. United States*. On June 28, 2024, the Supreme Court decided *Fischer*, 144 S. Ct. 2176

(2024). On September 11, 2024, in response to an order from the Court, the government stated that it intended to dismiss Count One following *Fischer*. Sentencing is set for December 9, 2024.

### III.    Statutory Penalties

Marroquin now faces a sentencing for violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(A), (D), and (G). Marroquin faces up to twelve months of incarceration for his violations of 18 U.S.C. § 1752(a)(1) and (2) and six months of imprisonment and a fine of up to $5,000 for his violation of 40 U.S.C. § 5104(e)(2)(A), (D), and (G).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

**Count 2: 18 U.S.C. § 1752(a)(1)**
| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Total Adjusted Offense Level | 6 |

**Count 3: 18 U.S.C. § 1752(a)(2)**
| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(A)) | +10 |
| Total Adjusted Offense Level | 10 |

The guidelines do not apply to the Title 40 offense charged in Counts Four, Five, or Six.

<u>U.S.S.G. §4C1.1 Does Not Apply</u>

Section 4C1.1 does not apply in this case, for the following reasons. Marroquin went deep into the Capitol during a violent riot and was part of a confrontation with officers in the Crypt.

Seeing these outnumbered officers, he told them to "put down their guns" and "get out of his house." Seconds later, he was mere feet from officers as they were being violently resisted and assaulted by the mob and did nothing to extricate himself from the situation. Instead, he filmed the assaults and, after having witnessed and recorded these assaults, cheered the crowd forward. He shouted to the crowd, "We ain't goin' to stop! Go through the door!" Marroquin cheered on the crowd and encouraged them to engage in violence. He therefore was using credible threats of violence against the police during the course of a violent riot. *United States v. Bauer*, 21-cr-386-2 (TNM), ECF 195 at 4-5 (defining "violence" as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm."); *see also United States v. Hernandez*, 21-cr-445 (CKK), ECF 65 at 5 (adopting definition of violence from *Bauer*); *see also United States v. Andrulonis*, 23-cr-085 (BAH), Sent. Tr. at 11-12 ("In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction.").

The government is aware of multiple cases in which courts have rejected the application of § 4C1.1 to January 6 defendants. However, due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the

government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[4]

Because the victim of these offenses is Congress, they form a single group. U.S.S.G. § 3D1.2(a) and (b). The offense level for the group is 10. U.S.S.G. § 3D1.3. Because Marroquin waived his right to a jury trial, the government does not oppose a two-level adjustment for acceptance of responsibility, under U.S.S.G. § 3E1.1(a), yielding an offense level of 8.

The U.S. Probation Office calculated Marroquin's criminal history as I, which is not disputed. PSR ¶ 44. However, Marroquin's criminal history category is *extremely* under representative. As noted in the PSR, Marroquin was convicted in 2008 of Rape of a Child or Adolescent and Human Trafficking or Smuggling of a Minor by a Bolivian Court in 2008. PSR ¶ 46-51. These crimes occurred when he was on a mission trip with a Texas church to Bolivia. According to public reporting, this case involved sexual misconduct against two 15-year-old girls and "irregularities in the adoption process" of a 7-year-old girl. Dan Selinger, "Angels in South America," THE AUSTIN CHRONICLE (August 31, 2007), *available at*

---

[4] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

https://www.austinchronicle.com/news/2007-08-31/531616/. He was sentenced to 25 years of incarceration and the convictions were subsequently upheld by the Corte Suprema de Justicia de Bolivia, which was then the highest appeals court in Bolivia. *See* Attachment 1 (certified translation of Bolivian Supreme Court decision and original decision in Spanish). From the government's reading of the PSR, it appears that the defendant failed to mention his time being incarcerated in Bolivia during his interview as he characterized his fourteen years of living there as "conducting missionary work." PSR ¶ 58. Accordingly, without any additional variances or departures, the range is 0 to 6 months.

*Upward Variance & Departure*

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). The Guidelines do not begin to capture Marroquin's criminal history, including his sexual assaults of girls during his years in Bolivia, during which he claimed to be doing missionary work. U.S.S.G. § 4A1.2(h) states that although foreign convictions are not counted for criminal history, they may be considered as a basis for a departure under U.S.S.G. § 4A1.3.

Moreover, the defendant's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes on January 6, which struck at the heart of our democracy and the rule of law. Marroquin was an avid and willing participant in an unprecedented crime. He joined a mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Marroquin "endanger[ed] our democratic

13

processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent. Tr. 9/22/22 at 86-87. The government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range.

Nothing in Marroquin's guidelines capture the unique nature of his crimes at the Capitol. Marroquin would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[5] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116 (DLF), Sent. Tr. at 85. A sentence within the defendant's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Guidelines expressly state that an upward departure is warranted where a case presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that

---

[5] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, 144 S. Ct. 2176 (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2). The Guidelines also provide that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. U.S.S.G. § 5K2.7.[6] In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducting the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75 (RDM), Sent. Tr., at 67. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime. Marroquin was determined to change the outcome of the democratic process by any means necessary, including threats and intimidation. *See United States v. Wyatt*, 23-CR-215 (RDM), Sent. Tr. at 44.

But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. History is not just the measure of events and the dates on which they occurred; history is the measure of how a society and its leaders choose to respond to those events to provide security, prosperity, and freedom to its posterity and, in doing so, form a more perfect union. Future generations will rightly ask what this generation and those who have filled these

---

[6] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

courtrooms did to prevent another such attack on our democracy from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime because it was not:

> "The effort undertaken by those who stormed the Capitol on January 6 […] was to stop the peaceful transfer of power following the legitimate outcome of our presidential election. That's a process that has been a hallmark of American democracy for 200 years. And that effort to reject the outcome of the 2020 presidential election involved an unprecedented and, quite frankly, deplorable attack on our democratic institutions, on the sacred ground of the United States Capitol building, and on the law enforcement officers who were bravely defending the Capitol and those democratic values against the mob of which the defendant was a part."

*United States v. Languerand*, 21-CR-353 (JDB), Sent. Tr., at 33-34.

Indeed, even before *Fischer*, judges of this Court gave significant upward departures and/or variances when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37 (TNM), Sent. Tr. 9/22/22; *United States v. Christian Secor*, 21-CR-157 (TNM), Sent. Tr. 10/19/22; *United States v. Hunter and Kevin Seefried*, 21-CR-287 (TNM). Sent. Tr. 10/24/22; *United States v. William Watson*, 21-CR-513 (RBW), Sent. Tr. 3/9/23; *United States v. Riley Williams*, 21-CR-618 (ABJ), Sent. Tr. 3/23/23; *United States v. Hatchet Speed*, 22-CR-244 (TNM), Sent. Tr. 5/8/23.

And several judges of this Court have upwardly departed in January 6 cases precisely because the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR-127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

16

Recently, in *United States v. Sparks*, 21-CR-87 (TJK), Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing, in light of the Supreme Court's *Fischer* decision, the government moved to dismiss the § 1512(c)(2) count, and at sentencing, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly found it important that despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posed a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sentencing Tr., at 87-88. The court found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id.* at 94-95. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification […] plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, the court found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of imprisonment.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson*

Sent. Tr., at 59. But the court also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification […] and that is so regardless of whether Section 1512(c) applies." *Id*. at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id*. After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment.

Likewise, in *United States v. Dunfee*, 23-CR-36 (RBW), Judge Walton sentenced a defendant on a § 231 conviction and a misdemeanor, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Walton found an upward departure was warranted under U.S.S.G. § 5K2.7, because Dunfee's actions contributed to and resulted in a significant disruption of the certification of the electoral college vote. Moreover, noting that "the Sentencing Commission did not contemplate the circumstances that occurred on January 6," the court also found that a departure was warranted under U.S.S.G. § 5K2.0(a)(2) because Dunfee's criminal conduct related to "the attempt by a large number of individuals, including the defendant, to stop the peaceful transfer of power." *See United States v. Dunfee*, 23-CR-36 (RBW), ECF 90, at 2. From an advisory range of 18-24 months, the court sentenced Dunfee to 30 months of imprisonment.

Most recently, in *United States v. Oliveras*, 21-CR-738 (BAH), Judge Howell sentenced a defendant on a § 231(a)(3) conviction, a § 111(a)(1) conviction, and four misdemeanors, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Howell found an upward departure was warranted under U.S.S.G. § 5K2.7 (Disruption of Governmental Function) because

> after *Fischer*, with the dismissal of [the defendant's] 1512(c)(2) conviction, none of the conduct that goes into determining defendant's sentencing guidelines reflect

his intent to engage in political violence that poses such a threat to our American democracy[.] His intent to obstruct Congress in the Electoral College certification by violence, if necessary, go above and beyond what any of his current convictions now take into account.

*Oliveras*, 21-cr-738 (BAH), Sent. Tr. at 49.

The court noted that "[i]n assessing the extent of the departure, review of how the guidelines for obstruction of an official proceeding at [U.S.S.G. §] 2J1.2 would have applied to defendant [pre-*Brock*] provide a general guide [and] an upward departure within that range is appropriate." *Id.* at 49-50. The court also noted that it "would impose the same sentence with… an upward variance for the same reasons that are outlined in § 5K2.7 and consideration of the 3553(a) factors." *Id.* at 97. From an advisory Guidelines range of 37-46 months' imprisonment, the court sentenced Oliveras to 60 months of imprisonment.

Because the seriousness of Marroquin's crime is not adequately captured by the applicable Guideline, an upward departure is appropriate here as well. If the Court declines to depart, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence […] would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392 (RCL), ECF 507, Sent. Tr. at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct."

*Sparks*, 21-CR-87 (TJK), Sent. Tr. at 95. *See also United States v. Kelly*, 21-CR-708 (RCL), ECF

151, Sent. Tr. at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal

bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer*

would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. §

3553(a)"); *United States v. Jensen*, 21-CR-6 (TJK), Sent. Tr. at 16 ("given the importance and the

significance of the proceeding of certifying the Electoral College votes, I would vary upward --

even if this [sentencing enhancement] didn't apply, I would vary upward when considering the

nature of the offense.")

In past sentencings, this court has made clear its view that January 6 was "an insurrection,

an attempt to install and empower the person who had lost at the ballot box." *United States v.*

*Ballenger*, 21-cr-719 (JEB), Sent. Tr. at 54. Those were not merely empty words—they were a

recognition of the seriousness and unprecedented nature of the riot. Marroquin contributed to the

unprecedented nature of the events that day and the lawlessness that unfolded in the Capitol. But,

also unprecedented is the need for January 6 sentences to promote respect for the law and deter

future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely

breaking the law. "There is a difference between breaking the law and rejecting the rule of law."

*See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[7]

In addition to departing upwards, other courts have varied upward from the advisory

guideline range specifically because of the unique and serious nature of the crimes committed that

day; this Court should do no less. *See United States v. Reffitt,* 21-CR-32 (DLF), Mem. Op. and

Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district

have noted, the proceedings at issue on January 6, 2021 were of much greater significance than

---

[7] Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-638 (TJK), Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157 (TNM), Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event—you obstructed the certification of an official proceeding—and your particular role in it […] require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37 (TNM), Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[8]

In this case, the government submits that an upward variance or departure of four months is warranted to reach an appropriate sentence. Marroquin spent more than an hour inside of the Capitol. During that time, he harassed, berated, and threatened officers, while ordering them to drop their weapons and turn away in the face of a violent mob. When these same officers were assaulted and accosted by the mob, he enthusiastically filmed the assaulted. He witnessed firsthand

---

[8] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

the destruction that the mob was unleashing on the Capitol and cheered on that destruction. His statements before and during the riot demonstrate that his intent in engaging in this conduct was to stop the certification of the results of the 2020 election; his statements after the riot and following his arrest show that he has no remorse for his conduct and has continued to try and spread blame and culpability for his crimes that day to anyone but himself. Moreover, Marroquin's criminal history category is *dramatically* understated. He was sentenced to twenty-five years in Bolivia in 2008 for sexually abusing two teenage girls and committing fraud in the adoption of a third girl. If Marroquin had been required to serve his full sentence in Bolivia, he would have been in jail on January 6, 2021, with another twelve years remaining on his sentence. His criminal conduct in Bolivia, which involved him taking advantage of a position of religious authority to sexually abuse disadvantaged children, is beyond egregious and merits an upward departure or variance to properly account for it.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

Sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a ten-month term of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Marroquin's participation in that attack to fashion a just sentence, this Court should consider various

aggravating and mitigating factors. Notably, given the charges in this case, the absence of violent or destructive acts is not a mitigating factor. Had Marroquin engaged in such conduct, he would have faced additional criminal charges.

The most significant aggravating factors of Marroquin's case can be reduced to two points: 1) Marroquin trespassed in the Capitol for more than an hour and did so for the purpose of stopping the certification of the 2020 presidential election results, 2) he was part of the stand-off at the House Chamber while lawmakers were being evacuated, and 3) the unrelenting manner with which he badgered, harassed, heckled, and threatened police officers during a violent riot. Multiple officers told Marroquin to leave the building, but he did not comply. Marroquin saw multiple officers being accosted but did not leave the premises. Instead, he continued deeper into the building, cheering the mob on, and encouraging the members of that mob on in their violent tear through the Capitol. He engaged in this conduct to interfere with the democratic process and the peaceful transition of power. These are significant aggravating factors and, accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of ten months of incarceration in this matter.

### B. Marroquin's History and Characteristics

As set forth in the PSR, Marroquin has never been charged with or convicted of a crime other than a traffic infraction in the United States. PSR ¶¶ 42-45. However, that significantly understates his criminal history. Marroquin was convicted of Rape of a Minor and Trafficking of a Minor in Bolivia. *Id.* at 46-51. Importantly, these convictions were the result of Marroquin abusing his position as a missionary who had gone to poor, rural parts of Bolivia to provide aid to the disadvantaged. In this position of power, he trafficked and sexually abused two minor girls and

committed fraud in the adoption process of a third girl.[9] For these convictions, he was sentenced to 25 years of incarceration, but was repatriated to the United States in 2012, after having spent only four years of his twenty-five-year sentence in a Bolivian prison. Marroquin did not mention anything about his criminal convictions in Bolivia to the Probation Office and instead described his fourteen years of living in Bolivia "conducting missionary work." PSR ¶ 58. This omission is telling of his character and his continuing refusal to admit or accept the unlawfulness of his conduct, even when that conduct has been extensively reported in the press.

Marroquin's conduct on January 6 was not a singular instance in an otherwise law-abiding life. His conduct at the Capitol was part of a larger pattern where he disregards both norms and laws for his personal benefit without regard to the harm that it causes to others.

## C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

---

[9] Ironically, in his respective speeches at the Lincoln Memorial on January 5, 2021, and inside the East Vestibule of the Capitol on January 6, 2021, Marroquin made repeated references to the Q'Anon conspiracy and wore a hat emblazoned with a "Q." A key tenet of the Q'Anon conspiracy is the baseless idea that "the elite" are trafficking children for nefarious ends.

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." *United States v. Thomas Gallagher*, 21-CR-41 Sent. Tr. 10/13/2021 at 37 (statement of Judge Nichols).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a ten-month term of incarceration. First, as discussed above, Marroquin's criminal history category is under representative of the criminal conduct he has engaged in during his life. He was previously convicted and ordered to serve more than two decades in a Bolivian jail for sexual abuse but was released after four years. This prior term of incarceration and even the extraordinary benefit of being released more than twenty years early and repatriated to the United States did not dissuade him from engaging in criminal conduct on

25

January 6 at the Capitol and encouraging others to engage in violence. Second, Marroquin's conduct in the Capitol shows that he is not someone who is easily deterred. Marroquin was told repeatedly to leave the Capitol by police officers but refused to follow their orders. Inside the Crypt, he came face to face with a line of police officers who were trying to prevent rioters from advancing. When he came upon this police line, Marroquin ordered them to put down their weapons and retreat in the face of the mob. This is not the conduct of someone who respects the rule of law or the lawful orders of police officers. Third, although Marroquin has accepted responsibility by plea to the misdemeanors charged against him, his post-arrest statements are troubling. Immediately after his arrest, Marroquin reveled in the newfound spotlight of having been arrested for his conduct at the Capitol. He denied any responsibility and continued to push baseless conspiracy theories about who was responsible for the riot. The public persona that Marroquin has presented is that of someone who is proud of his conduct—not someone who has fully accepted responsibility. The Court should sentence Marroquin in a manner sufficient to deter him specifically and others generally from going down that road again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[10] This Court must sentence Marroquin based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Marroquin has pleaded guilty to Counts Two through Six of the Indictment. These offenses are a Class A and B misdemeanors. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply to the offenses of conviction.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Anthony Griffith*, 21-cr-244 (CKK), the defendant, like Marroquin, entered the Capitol despite the many warning signs that a violent riot was underway. Marroquin and Griffith both encouraged the mob forward by shouting motivating phrases. Griffith also shouted at police and demanded that they permit him to enter the building. This is similar conduct to Marroquin who shouted that police officers lay down their arms to permit the rioters to get further into the building. Griffith, like Marroquin, watched as other rioters ransacked the building and damaged property inside. Also like Marroquin, Griffith saw torn apart offices and also demonstrated inside of the Crypt. Unlike Marroquin, Griffith was not involved with the armed stand off with police at the door to the House Chamber. Griffith, unlike Marroquin, entered the Capitol a second time. However, like Marroquin he was inside the Capitol for a lengthy total period of time with Griffith being inside for forty-five minutes and Marroquin being inside for more than an hour. Like Marroquin, Griffith expressed little—if any—remorse for his conduct and was less than forthcoming in his interview with Probation. Griffith was convicted of 18 U.S.C. § 1752(a)(1)

and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G) and Judge Kollar-Kotelly sentenced him to six months incarceration.

In *United States v. Matthew Huttle*, 22-cr-403 (CRC), Huttle was at the forefront of the mob as they overwhelmed police officers who were guarding the area. This is very similar to Marroquin's conduct, who repeatedly encouraged the mob forward despite a heavy police presence and express orders from the police to stop the advance and leave the building. In the Capitol, Huttle, like Marroquin, was moving through the building searching for lawmakers and those involved in the certification process. Like Marroquin, Huttle remained on the Capitol grounds for a protracted time after being ejected from the Capitol. Also like Marroquin, Huttle had prior criminal convictions, but Huttle's were from the United States. Huttle pled guilty to a violation of 18 U.S.C. § 1752(a)(1) and Judge Cooper, noting Huttle's apparent lack of remorse, sentenced him to six months of incarceration.

Marroquin's conduct is worse than the conduct in both *Griffith* and *Huttle*. In his statements leading up to January 6, Marroquin made it clear that he was going to Washington with the purpose of interfering in the certification process. On January 4, 2021, he stated that he was "going on the offensive." His statements inside the Capitol further evinced this intent. He spent considerably longer in the Capitol than both Griffith and Huttle and refused to leave the building until he was pushed out of the building. Unlike Griffith and Huttle, Marroquin also came face-to-face with an officer holding up a firearm and *still* refused to leave the building. That this standoff happened while lawmakers were still being evacuated from the House Chamber also makes this cases an order of magnitude worse than both Huttle and Griffith. Marroquin has also expressed no remorse or contrition for his conduct and, based on his social media posts following his arrest, is proud of his status as a January 6 defendant. Moreover, neither Huttle nor Griffith have Marroquin criminal

history.[11] On balance, Marroquin's conduct and history merits a longer sentence than both Huttle and Griffith.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

### F.  **Restitution**

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with

---

[11] The government additionally directs the court to *United States v. Kasey Hopkins*, 22-cr-317 (TSC), who pled guilty to a single count of 40 U.S.C. § 5104(e)(2)(G). Hopkins was convicted in the forcible rape in 2002. In sentencing Hopkins, Judge Chutkan noted that Hopkins had decided to risk his business and his rehabilitation by committing additional crimes on January 6. Judge Chutkan considered this prior rape conviction to be a significant aggravating factor and ultimately sentenced the Hopkins to four months incarceration on a Class-B misdemeanor.

discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C.

2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[12]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Marroquin to pay $500 in restitution for his convictions on Counts Two through Six. This amount fairly reflects Marroquin's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

### G. Fine

The defendant's convictions for violations of [specify statutes of conviction] subject him to a statutory maximum fine of $20,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to ten months incarceration, twenty-four months supervised release, and $500 in restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    *s/ Sean P. McCauley*
SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov